UNION GRAIN & ELEVATOR COMPANY, a Corporation, Appellant, v. McCAMMON DITCH COMPANY, a Corporation, et al., Respondents.

[240 Pac. 443.]

WATER RIGHTS—APPROPRIATION—MILL PURPOSES—EXTENT OF RIGHT—ABANDONMENT.

1. To the extent that a mill owner actually applied the waters of a stream to furnish power to operate the mill, he acquired a right to such use as against all subsequent claimants.

2. The right of a person to the waters of a stream for mill purposes is limited to the quantity of water reasonably necessary and actually used to operate the mill.

3.  Where increases in the capacity of a mill required greater quantities of water to operate the mill, such additional requirements were ineffectual as against owners of intervening rights.

4.  Abandonment is the relinquishment of a right by the owner thereof without any regard to future possession by himself or any other person but with the intention to forsake or desert the right.

APPEAL from the District Court of the Fifth Judicial District, for Bannock County. Hon. O. R. Baum, Judge.

Suit to quiet title to water right. Judgment for defendants. *Reversed* and *remanded,* with instructions.

D. W. Standrod and Jas. B. Bacon, for Appellant.

There is no finding of fact on which to base the court's conclusion wherein it deprives the plaintiff of the water during the months of July and August; hence the conclusion of law in this respect, and likewise the judgment, are erroneous. (C. S., sec. 6867; *Carson v. Thews,* 2 Ida. 176, 9 Pac. 605; *Stanley v. Flint,* 10 Ida. 629, 79 Pac. 815; *Stoneburner v. Stoneburner,* 11 Ida. 603, 83 Pac. 938; *Muir v. Allison,* 33 Ida. 146, 191 Pac. 206.)

There was never any abandonment by plaintiff or its predecessors in interest of any of the water rights to which it was entitled since 1892. (*Smith v. Hope Min. Co.,* 18 Mont. 432, 45 Pac. 632; *Nichols v. MacIntosh,* 19 Colo. 22, 34 Pac. 278; Long on Irrigation, 2d ed., 336; *Parsons v. Fort Morgan Res. & Irr. Co.,* 56 Colo. 146, 136 Pac. 1024; *Miller v. Wheeler,* 54 Wash. 429, 103 Pac. 641, 23 L. R. A., N. S., 807; *Hall v. Lincoln,* 100 Colo. App. 360, 50 Pac. 1047; *Welch v. Garrett,* 5 Ida. 639, 51 Pac. 405; *Ada County v. Farmers' Irr. Co.,* 5 Ida. 793, 51 Pac. 990, 40 L. R. A. 485.)

After finding that the plaintiff's appropriation had been made of a certain date, and for certain volume of water, and for a beneficial use, it was error in the court to strike out virtually two months of the year, when plaintiff should be deprived of same; there was nothing in the testimony to warrant the court in giving to the plaintiff anything but a continuous use of the water. (*Hillman v. Hardwick,* 3

Ida. 255, 28 Pac. 438; *Cottonwood Co. v. St. Michael's Monastery,* 29 Ida. 761, 162 Pac. 242.)

Stevens & Downing, for Cross-appellant, Lava Irrigation Co.

Under a pleading, claiming title to the public waters of the state, a decree must be based upon the amount of water actually diverted and applied to a beneficial use. (*Basinger v. Taylor,* 30 Ida. 289, 164 Pac. 522; *Reno v. Richards,* 32 Ida. 1, 178 Pac. 81.)

A prior appropriator is only entitled to the water to the extent that he has use for it when economically and reasonably used. (*Washington State Sugar Co. v. Goodrich,* 27 Ida. 26, 147 Pac. 1073.)

McDougall & Jones, for Respondent Portneuf-Marsh Valley Canal Co.

Appropriation of water depends upon the beneficial use to which the water has been applied and the right is determined by the proof of such use. Water may be appropriated by one appropriator for a portion of the time for one purpose, and another appropriator for the remainder of time for another purpose. (Wiel on Irrigation, p. 318.)

An appropriation is not periodical in character unless so intended; such intent being drawn from the acts and circumstances as much as from the appropriator's actual expression of claim or notice. (*City of Telluride v. Davis,* 33 Colo. 355, 108 Am. St. 101, 80 Pac. 1051.)

Budge & Merrill, Peterson & Coffin, H. B. Thompson, W. H. Witty, R. W. Jones, Jones, Pomeroy & Jones, T. F. Terrell, R. D. Merrill, and Thomas & Andersen, for Other Respondents, cite no authorities.

WM. E. LEE, J.—This is an action to quiet the title of plaintiff in and to 148 second-feet of the waters of the Portneuf River in Bannock county for manufacturing pur-

poses. It was begun in 1914 by a predecessor of plaintiff. A large number of individual water users and ditch companies were made parties. Plaintiff alleged that in 1892 one Harkness constructed a flour-mill at McCammon, diverted 148 second-feet of water from Portneuf River to the mill and that ever since that time, except when such water was wrongfully withheld, Harkness and his successors have continuously and necessarily used 148 second-feet of the waters of the stream to operate the mill and to generate electricity for use at the mill and for sale in McCammon. It was stipulated that the allegations of the complaint were deemed denied. The defendants and each of them appeared by separate answer and cross-complaint in which they respectively pleaded their water rights; and all the cross-complaints were deemed denied.

The trial commenced late in 1920 and required many weeks. Much testimony was taken, the transcript comprising eight large volumes of more than three thousand typewritten pages. The trial court found

"That on the said 1st day of July, 1892, the said plaintiff diverted at said point of intake by means of said conduit, canal or flume 97.55 cubic feet per second of time of the waters flowing and to flow in said Portneuf River, for the purpose of producing and generating sufficient power to run and operate said mill and the machinery and elevators therein, and connected therewith, and for the purpose of generating electricity with which to light the mill and mill premises. And has ever since said date continuously and uninterruptedly, except when unlawfully hindered and interrupted by certain users of the waters of said stream above said point of diversion, used said amount of water so appropriated for the said purposes. That said amount of water so appropriated by said plaintiff was and is necessary for the successful operation of said mill as aforesaid."

As a matter of law the court concluded that the plaintiff " . . . . is entitled to the use at all times of 97.55 cubic feet per second of time of the waters of said Portneuf River, its right of appropriation to date from the 1st day of July,

1892, for the purpose of generating power to run and operate its mill . . . . '' and adjudged that plaintiff '' . . . . have at all times during the irrigation season the use of 97.55 cubic feet per second of time of the waters of said Portneuf River . . . . for the purpose of producing and generating power to run and operate its mill . . . . its right to use of the same to date from the 1st day of July, 1892 . . . . ''

From this decree no appeal was taken; but a representative of the department of reclamation, one Pierce, commenced the distribution of the waters of the river according to the decree. Within thirty days of the entry of the decree it was discovered by Pierce and certain water users that there was then flowing in the river and its tributaries a total of 207.96 second-feet; and it was further determined that, if awarded according to the priorities fixed by the decree, the Portneuf Irrigating Company (with a right dating from 1889) would get 55 second-feet; the McCammon Ditch Company (with a right dating from 1889) would get 50 second-feet; appellant (with a right dating from 1892) would get 97.55 second-feet; the McCammon Ditch Company (with a second right dating from 1901) would get 5.41 second-feet, the remainder of the water; and that a large number of those who had theretofore been receiving water from the river and its tributaries and to whom rights had been decreed would receive no water whatever. On motion of certain of the defendants, and over the objection of plaintiff, the court vacated the first decree ''for the purpose only of further considering the plaintiff's right to the waters of Portneuf River during the irrigation season and of taking additional evidence with respect to such right . . . . '' An appeal was taken from this order, but it was abandoned. The court thereafter heard a number of witnesses on the part of both plaintiff and defendants, and made new findings and conclusions, and on December 4, 1922, made and entered a new decree in which plaintiff's right was restricted to 97.55 second-feet of water ''between the first day of January and the ninth day of July, both dates included, and the

first day of September and the thirty-first day of December, both dates included.'' From this latter decree, plaintiff appealed.

Appellant's principal assignment of error relates to the action of the court in denying (in the second decree) its claim to a continuous flow of 97.55 second-feet of the waters of the Portneuf River, and asks this court to remand the cause with instructions to make findings of fact and conclusions of law, as originally made, and enter a decree awarding to it a right to a continuous flow of 97.55 second-feet of the waters of the stream during the entire twelve months of the year. On the contrary, it is contended by cross-appellants that the court erred in finding that appellant was entitled to a right to a continuous flow of 97.55 second-feet of the waters of the stream from September 1st to December 31st, inclusive, and from January 1st to July 9th, inclusive; and that the evidence is insufficient to sustain the finding and decree in that respect.

The first material inquiry is whether Harkness ever acquired a right to any of the waters of the Portneuf during the dry season. There is no doubt about the construction of the mill in 1892; that the waters of the river were actually diverted and applied to the beneficial use of producing power for the operation of the mill is established beyond question. To the extent that Harkness actually applied the waters of the stream to a beneficial use, he thereby acquired a right to such use as against all subsequent claimants. His right, however, to the use of the waters must be measured by the extent of such use during the dry season. In other words, that he used 97.55· second-feet before or after the irrigation season, when prior users were making no use of their rights, would be of little value in determining the extent of his use in the dry season when those who had prior rights were using the water to which their rights entitled them and when the stream was lowest. While the evidence shows that the mill was not operated continuously during the dry season of each and every year; that it was closed sometimes for one reason and sometimes for another;

and that it was seldom, if ever, operated at night during the dry season; there can be no serious doubt that the evidence shows that the mill was operated in the dry season and that appellant acquired a right to water from the stream for mill purposes. Mr. Whitehead, head miller from 1896 to 1906, probably respondent's best witness on this subject, said the mill "had been running pretty steady in the summer time up to 1900." While we are convinced that the evidence shows that appellant had acquired a right to a continuous flow of water during the dry season, we are equally certain that it was not, under the evidence, entitled to 97.55 second-feet. As we read the evidence, the engineer, Burkett, during the first hearing, made measurements by which he determined that 97.55 second-feet was the quantity of water required to keep the mill in operation. The measurements were not made when there was a scarcity of water but in December, 1920, while the elevators and machinery were all running and the mill was being run at its maximum capacity. From all the evidence we are satisfied that the mill was not run in the dry season as it was running that day in December when it was measured by the engineer. Witness Whitehead, who was head miller from 1896 to 1906 and who worked at the mill later in 1916, testified that some changes were made in the machinery of the mill about 1900 by which the capacity of the mill was increased from 100 to 150 barrels per day. He said that it took about one-third as much water to operate the mill before the changes were made as it did after they were made. In 1916 other changes were made according to Whitehead, that made it necessary to use "about twice as much" water. We are not relying solely on the evidence of Whitehead. From practically all the witnesses testimony was elicited to the general effect that the mill did operate during the dry season, but that it was not operated twelve hours a day nor to its maximum capacity during the dry seasons, and that a right to a continuous 24-hour a day flow of 97.55 second-feet during the dry season was never acquired.

It would appear that in such a case as this, evidence should have been presented to the trial court from which it could have determined the quantity of water required to run the mill during the low-water periods prior to the time that the capacity of the mill was increased and prior to the time that subsequent rights to the waters of the river were acquired. It would not appear to one not versed in the operation of a flour-mill by water-power that as much water would be required to operate a mill of 100 barrels capacity as the same mill increased to 250 barrels capacity, that a mill at either capacity could be run with less water when grinding at normal than at maximum capacity, and that by disengaging the machinery and appliances about the mill, as would naturally be done when the water was scarce, the work of grinding could be done on less than the maximum power testified to by the engineer. While appellant is entitled to have its rights protected by the court, it must not be awarded other or greater rights, as against other appropriators of the waters of the river, than it is entitled to under the law. The right of appellant to the waters of the Portneuf River for mill purposes was limited to the quantity of water reasonably necessary to operate the mill. If the increases in the capacity of the mill in 1900 and 1916 required greater quantities of water, such requirements were ineffectual as against those who had acquired intervening rights.

After having strenuously insisted that Harkness never acquired a right to any of the waters of the river, some of the respondents insist that the right acquired to the use of certain of the waters of the stream during the dry season was abandoned by Harkness. This, they say, is established by the evidence that he frequently shut down the mill during the dry season and made statements to the effect that he would let the farmers have the water and that if the farmers did not raise any wheat his mill would be of no use to him. Such actions and statements, if true, do not constitute abandonment. There can be no abandonment without an intention to abandon.

In *Syster v. Hazzard*, 39 Ida. 580, 229 Pac. 1110, this court said that "abandonment is a matter of intent coupled with corresponding conduct." And in *Joyce* v. *Murphy Land etc. Co.*, 35 Ida. 549, 208 Pac. 241, it was said that "abandonment is the relinquishment of a right by the owner thereof without any regard to future possession by himself or any other person, but with the intention to forsake or desert the right." Abandonment may be shown by the facts and circumstances, but clear proof is required to make out a case. The proof here falls far short of abandonment. There is not the slightest evidence that Harkness, by permitting the use at times of water to which he had a prior right, intended thereby to abandon his right. The fact that he did operate his mill at times during the dry season and that he "begged" water at times from some of those with prior rights effectively negatives any intent to abandon his right.

From what has been said, it follows that the cause must be reversed and remanded to the trial court with instructions to permit the parties to produce additional evidence to show the extent of the right of appellant prior to the time the capacity of the mill was enlarged and prior to the time that subsequent appropriators acquired their rights; and make findings of fact and conclusions of law and enter a decree in accordance with the evidence and with the views herein expressed.

In view of the conclusions reached it is unnecessary to consider other questions raised.

Costs to appellant.

Givens and Taylor, JJ., concur.

Budge, J., being disqualified, did not participate in the hearing or decision.

ON MOTION TO ALLOCATE COSTS.

(October 27, 1925.)

WM. E. LEE, J.—Appellant will recover its costs on this appeal from those respondents whose priorities were adjudged to be subsequent to July 1, 1892. Costs on appeal will be apportioned against each respondent liable therefor, in the proportion that the quantity of water decreed to each bears to the aggregate of all the water decreed to the respondents liable for costs. No respondent is liable for any costs other than the amount actually taxed against him

William A. Lee, C. J., and Taylor and Givens, JJ., concur.

Budge, J., being disqualified, did not participate in the decision.