Percy B. Eckhart, Executor of the Estate of Bernard A. Eckhart, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 76443. Promulgated November 12, 1935.

*William A. McSwain, Esq.,* and *Robert F. Spindell, Esq.,* for the petitioner.

*Ralph E. Smith, Esq.,* and *Arthur L. Murray, Esq.,* for the respondent.

428

435

OPINION.

TRAMMELL: The first and principal issue in this case is whether
or not certain direct gifts *inter vivos* and transfers in trust made by
the decedent to and for the benefit of his wife, children, and grand-
children, during the years 1919 to 1930, both inclusive, were made in
contemplation of death, within the meaning of the taxing statute.

Section 302 (c) of the Revenue Act of 1926, as amended by Joint
Resolution No. 131, 71st Cong., approved March 3, 1931, applicable
here, provides, among other things, that the value of the gross estate
of the decedent shall be determined by including the value at the time
of his death of all property, wherever situated, to the extent of any
interest therein of which the decedent has at that time made a trans-
fer, by trust or otherwise, in contemplation of or intended to take
effect in possession or enjoyment at or after his death, including a
transfer under which the transferor has retained for his life or any
period not ending before his death (1) the possession or enjoyment
of, or the income from, the property, or (2) the right to designate
the persons who shall possess or enjoy the property or the income

therefrom; except in case of a bona fide sale for an adequate and full consideration in money or money's worth.

No contention is made in this proceeding that any of the transfers in controversy were intended to take effect in possession or enjoyment at or after the decedent's death, nor that he retained for his life the possession or enjoyment of any of the property or the income therefrom, or the right to designate the persons who should possess or enjoy such property or income. The sole question is whether the transfers were made " in contemplation of death."

The meaning of the phrase " in contemplation of death " has been the subject of judicial consideration on numerous occasions and a long line of decisions more or less to the same general effect might be cited, but for purposes of the present case, a comprehensive discussion of the term is embodied in the opinion of the Supreme Court in *United States* v. *Wells*, 283 U. S. 102, decided April 13, 1931. The statute involved there was section 402 (c) of the Revenue Act of 1918, which, so far as material here, is substantially the same as section 302 (c) of the 1926 Act, *supra*. From the opinion of the Court, delivered by the Chief Justice, we quote as follows:

Transfers in contemplation of death are included within the same category, for the purpose of taxation, with transfers intended to take effect at or after the death of the transferor. The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax. *Nichols* v. *Coolidge*, 274 U. S. 531 * * * *Milliken* v. *United States*, 283 U. S. 15 * * *. As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be " contemplated," that is, the motive which induced the transfer must be of the sort which leads to testamentary disposition. As a condition of body and mind that naturally gives rise to a feeling that death is near, that the donor is about to reach the moment of inevitable surrender of ownership, is most likely to prompt such a disposition to those who are deemed to be the proper objects of his bounty, the evidence of the existence or non-existence of such a condition at the time of the gifts is obviously of great importance in determining whether it is made in contemplation of death. The natural and reasonable interference which may be drawn from the fact that but a short period intervenes between the transfer and death is recognized by the statutory provision, creating a presumption in the case of gifts within two years prior to death. But this presumption, by the statute before us, is expressly stated to be a rebuttable one, and the mere fact that death ensues even shortly after the gift does not determine absolutely that it is in contemplation of death. The question, necessarily, is as to the state of mind of the donor.

\* \* \* \* \* \* \*

It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. It is conceivable that the idea of death may possess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand. Old age may give premonitions and prompting independent of mortal disease. Yet age in itself can not be regarded as furnishing the decisive test, for sound health and purposes associated with life, rather than with death, may motivate the transfer.

The words " in contemplation of death " mean that the thought of death is the impelling cause of the transfer  *  *  *

If it is the thought of death, as a controlling motive prompting the disposition of property, that affords the test, it follows that the statute does not embrace gifts inter vivos which spring from a different motive.  *  *  *  The purposes which may be served by gifts are of great variety. It is common knowledge that a frequent inducement is not only the desire to be relieved of responsibility, but to have children, or others who may be the appropriate objects of the donor's bounty, independently established with competencies of their own, without being compelled to await the death of the donor and without particular consideration of that event. There may be the desire to recognize special needs or exigencies or to discharge moral obligations. The gratification of such desires may be a more compelling motive than any thought of death.

For further discussion of the principles announced in the *Wells* case, see *Willcuts* v. *Stoltz*, 73 Fed. (2d) 868. See also *Real Estate Land Title & Trust Co.* v. *McCaughn*, 79 Fed. (2d) 602.

In the case at bar the evidence clearly establishes that beginning in 1908 the decedent adopted a policy, thereafter consistently followed to and including the year 1930, of making substantial gifts *inter vivos* to the members of his family and establishing trusts for their benefit. During the period mentioned decedent made 108 separate gifts to and created 10 irrevocable trusts for the benefit of those who were the appropriate objects of his bounty. The fair market value of the gifts exceeded $4,000,000, and of the trusts, $2,000,000. Yet decedent died possessed of an estate valued at more than $5,000,000. The declared purpose of the decedent in making gifts directly to the members of his family and transfers in trust for their benefit was to provide them with independent competencies, so that they might enjoy the use of a part of his property without having to wait for his death.

Another purpose which motivated decedent in this matter was to accustom his children to the handling and management of large amounts of property during his lifetime, while he could teach them habits of thrift and economy, and to live within their incomes. The decedent through the years often discussed with his family and business associates the purposes which prompted his policy of making gifts.

In respect of the trusts created and the gifts *inter vivos* made by decedent during the period from 1919 to 1926, inclusive, the evidence shows that the decedent had theretofore never been seriously ill in his life, had suffered only minor ailments, and was enjoying unusually sound and robust health. We find nothing in the record to justify the conclusion that his state of mind involved contemplation of death, or that the gifts in any manner constituted testamentary dispositions of property. On the contrary, the evidence con-

vinces us that the gifts made during the period referred to were pursuant to decedent's long-established policy of making such gifts to his family, and that his purposes were distinctly associated with life rather than with death.

We, therefore, have no difficulty in concluding, and have so found as a fact, that the eight (8) transfers in trust made by decedent in 1919 to 1926, of various securities having a fair market value at his death of $1,022,233.12, and the five (5) gifts of De Soto Securities Co. common stock made by decedent to his wife and children on December 24, 1923, were not made in contemplation of death within the purview of the statute.

In respect of the five gifts aggregating 500 shares of beneficial interest in De Soto Realty Trust made by decedent to his wife and children on March 19, 1930, and the transfer in trust on April 3, 1930, of 9,750 shares of preferred stock of the De Soto Securities Co., a little more than a year prior to his death, a somewhat more difficult problem is presented. Decedent was then more than 81 years of age, and in January of the preceding year had undergone a serious surgical operation for the removal of his prostate gland. He was no longer enjoying the sound and robust health of his earlier years. However, as against these facts it is shown that the decedent believed that he had fully recovered from the prostate operation; his health was reasonably good for a man of his age; he did not know that he was suffering from carcinoma, or cancer, of the prostate; he was actively engaged in the personal direction of his various business interests; during 1929 and 1930 subsequent to his operation decedent assumed the additional burden of directorships in two large corporations, and entered into syndicate agreements involving a combined liability of $1,250,000, which syndicates and agreements continued until after his death; during the same period decedent was planning the erection of a large office building in Chicago, and in August 1930 took part in an attempt to consolidate two of the large Chicago banks, in both of which he was a director.

As pointed out by the Supreme Court in the *Wells* case, *supra*, age in itself cannot be regarded as furnishing the decisive test, but the question is as to the state of mind of the donor. His state of mind can be determined only from the contemporaneous statements, acts and conduct of the donor. Considering the facts in the instant case, above referred to, it is our opinion that the decedent's state of mind indicated thereby does not support the conclusion that the five gifts of March 19, 1930, nor the gift of April 3, 1930, were made in contemplation of death, and we have found that they were not so made.

In *Heiner* v. *Donnan* (C. C. A., 3d Cir.), 61 Fed. (2d) 113, the decedent was 78, 81, and 82 years of age when he made the transfers which the court held were not made in contemplation of death. Also, the decedent died within two years of the last transfer, which comprised more than half of his total assets. Notwithstanding the age of the decedent at the time the gifts were made, the court concluded that the transfers were motivated by purposes associated with life rather than with death.

In *Brown* v. *Commissioner* (C. C. A., 10th Cir.), 74 Fed. (2d) 281, reversing 29 B. T. A. 1183, the court applied the test defined in the *Wells* case, and held that a transfer of stock by the decedent to his wife when he was 73 years of age, and only two months and 19 days before his death, was not made in contemplation of death. The court accepted the taxpayer's contention, held to have been erroneously rejected by the Board, that the transfer was in keeping with the decedent's long-established custom of making gifts to his wife and children in order to provide them with independent means and incomes of their own.

In respect of the forgiveness by the decedent on March 23, 1931, of an indebtedness owing to him by the De Soto Securities Co. in the amount of $234,788.84, which respondent contends was a gift made in contemplation of death, we think an entirely different picture is presented. Decedent was then in his last illness, from which he died one month and nineteen days later. During the preceding several months his physical condition had become gradually worse, and in the early part of 1931 the change in his appearance was most marked. We think it can not be assumed that a man of decedent's long experience and mental alertness could have failed to realize that the end of his life was rapidly approaching, that death was imminent. Furthermore, it was about this time that decedent had expressed a desire to have Dr. Bevan operate on his intestines, and upon the refusal of the doctor to operate the decedent showed unmistakable evidence of a realization of the seriousness of his condition. In the light of the facts and circumstances discussed, the respondent's contention on this point is sustained.

There remains for consideration issue (4), which involves the amount of the deduction to which petitioner is entitled on account of the liability of decedent's estate on two promissory notes endorsed by the decedent during his lifetime.

Section 303 of the Revenue Act of 1926 provides that, for the purpose of the tax, the value of the net estate shall be determined by deducting from the value of the gross estate, among other things, " claims against the estate " to the extent that such claims were in-

curred or contracted bona fide and for a full and adequate consideration in money or money's worth, and allowed by the laws of the jurisdiction under which the estate is being administered. No question is raised in this case that the claim upon which the deduction is based was not incurred or contracted bona fide and for an adequate money consideration. The issue goes only to the amount of the deduction which is allowable. The petitioner contends that he is entitled to a deduction in the amount of $129,081.44, while respondent asserts that the amount allowable is $82,427.62.

During his lifetime decedent endorsed two promissory notes, which were payable on demand. The unpaid balance due on the notes at decedent's death was $147,853.44. The notes were secured by collateral having a fair market value of $65,425.82. Subsequent to decedent's death the holder of the notes made demand upon the makers for payment, and upon their failure to pay the amount due, filed claim therefor against decedent's estate in the probate court. On May 16, 1932, the probate court allowed the claim for the full amount due, $147,853.44. On June 27, 1932, the collateral security was sold for its then fair market value of $18,772, which amount was applied against the claim allowed by the probate court, reducing the claim to $129,081.44, which the estate immediately paid.

The latter amount is the amount claimed by the petitioner as a deduction. Respondent contends that since tax liability is determined upon the basis of the value of the estate at the date of decedent's death, the allowable deduction is the amount of the claim allowed by the probate court, less the value of the collateral security at decedent's death, or the amount of $82,427.62.

We can not agree with respondent's view. While it is true that for purposes of the tax property is valued as of the date of decedent's death, the statute specifically provides for the deduction of funeral expenses, administration expenses, claims against the estate, losses incurred during settlement of the estate, and amounts expended during settlement of the estate for the support of the decedent's dependents, all of which arise subsequent to the decedent's death, and the amounts of such deductions are not determined with regard to the date of death.

In respect of the item here in dispute, it must be remembered that there was no matured liability on the part of the estate at the date of the decedent's death. At that time the liability was wholly contingent, and if the collateral security had had a fair market value equal to or in excess of the unpaid balance due on the notes, there would have been no claim presented against the estate. The estate became liable only when the makers failed to pay upon demand of the holder, both of which events transpired subsequent to

decedent's death. The liability of the estate thereupon became fixed, but the amount of such liability could not be definitely determined until the collateral security had been sold and the proceeds applied against the unpaid balance due upon the notes. When this had been done the amount of the estate's liability was fixed and determined, and such amount was immediately paid by the estate. Petitioner is entitled to the deduction in the amount claimed.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*