## IDAHO FARMS CO. v. NORTH SIDE CANAL CO., Limited.

### No. 1997.

District Court, D. Idaho, S. D.
May 24, 1938.

Edwin Snow, of Boise, Idaho, and A. F. James, of Gooding, Idaho, for plaintiff.

Richards & Haga, of Boise, Idaho, Wayne A. Barclay, of Jerome, Idaho, and Frank L. Stephan and J. H. Blandford, both of Twin Falls, Idaho, for defendant.

CAVANAH, District Judge.

The nature of the suit is one brought by the plaintiff, a Delaware Corporation, against the defendant an Idaho Corporation, to quiet title to certain lands and water rights acquired in the enforcement of Carey Act contracts.

The history of the acquisition of the lands and water rights as described by the pleadings and the evidence appears to be that many years ago the plaintiff then known as Twin Falls North Side Land and Water Company, organized under the law of Delaware entered into certain contracts with the State of Idaho under the provisions of an Act of Congress known as the Carey Act, 43 U.S.C.A. § 641 et seq., and the laws of Idaho applicable, whereby it agreed to construct certain irrigation works for the irrigation of some 200,000 acres of land now situated in the counties of Jerome, Gooding and Elmore, Idaho, which were then segregated to the State under the Carey Act, and agreed to sell to the settlers upon the lands water rights or shares in the system so to be constructed. The plan and method of procedure for the contruction of the system and for selling water contracts and for its

completion and operation was that a corporation be formed known as the North Side Canal Company, which is the defendant, with a capital stock of 200,000 shares delivered to the Twin Falls North Side Land and Water Company in consideration of the building by it of the system and which was delivered to it for sale to the settlers under the system. The original purchaser of the water right for a specific tract of land to be reclaimed did enter into a water contract with the Construction Company in which the company sold to the landowner one share of its capital stock as a water right for each acre of land to be irrigated. Between the years 1907 and 1920, the Construction Company completed the irrigation project and contracted for sale to the landowners of approximately 170,000 shares of water rights, and in 1921 transferred the ownership and operation of the system to the defendant who is now operating the same as the owner.

About November 1, 1907, for the purpose of securing funds with which to construct the system, the Construction Company executed to the American Trust and Savings Bank, as trustee, its deed of trust by which it mortgaged to the trustee all its interest in the system, water rights, franchises. and water contracts, then or thereafter to be entered into, and all moneys due or to become due to secure an authorized issue of $5,000,000 of bonds. Thereafter the Continental and Commercial Trust and Savings Bank, by merger and change of corporate name, succeeded to all the rights and obligations of the American Trust and Savings Bank as trustee under the mortgage, and assigned contracts. In December 1927, the Continental and Commercial Trust and Savings Bank, merged and consolidated with the Continental and Commercial National Bank, under the name of the Continental National Savings Bank and Trust Company and thereafter continued to be successor trustee for the bondholders. In the year 1913, and while the system was uncompleted, and before water had been fully available for the irrigation of all the lands, the Construction Company became insolvent and failed. The individuals then owning the outstanding bonds appointed a bondholder's protective committee who advanced on behalf of the bondholders additional sums of money which was used in the subsequent completion of the system. The committee acting in conjunction with the trustee of the bondholders, took over the management of the Construction Company and all of its property and business, and operated the same until in 1921, when the project was conveyed to the defendant. Subsequent to the execution of the deed of trust the Construction Company deposited as pledged to the trustee for the holders of the bonds all contracts for the sale of water rights or shares in the system which to the extent of the amounts unpaid constituted a lien upon the lands and shares of stock. Upon the default being made of certain water right contracts it was necessary for the trustee to proceed and foreclose the liens, and by reason thereof certain real property situated in Gooding, Elmore and Jerome Counties, together with the share of stock were purchased under the water contracts. In 1913, when the Twin Falls North Side Canal and Water Company became insolvent, its stockholders owned and were operating a subsidiary corporation known as the Twin Falls North Side Investment Company, whose capital stock was owned by the Construction Company. At that time the lien of the outstanding bonds was in an amount greater than the value of its assets, and under those circumstances the stockholders of the Construction Company turned over to the Bondholders Committee a majority of the capital stock of the Construction Company and of the Investment Company. Just prior to December 11, 1936, the then trustee for the bondholders, conveyed to the Construction Company all the water right contracts and lands which was part of a plan and method by which all of the assets secured by the deed of trust were to be and were transferred to the bondholders. After that was done the trustee released of record the deed of trust. The Investment Company then became merged into the Construction Company who constituted the surviving corporation which name was changed to the Idaho Farms Company and a new stock issue of the par value of $45 each was issued pro rata among the bondholders in exchange for their bonds. By reason of the transfer from the trustee to the Construction Company and the merger, the plaintiff became the owner and in the possession of all the property listed in "Exhibit B" attached to the complaint.

It further appears that by the terms of the State Contract, dated August 21, 1907,

the Construction Company was authorized to sell water rights for $35 per share, and by the terms of the State Contract dated January 2, 1909, it was authorized to sell water rights for $45 per share. Since the acquisition of the properties by the plaintiff and its respective grantors, they have paid out sums of money for taxes. The bond-holders have been reimbursed to the extent of fifty-five per cent. of the actual principal sum advanced. From time to time the defendant has levied assessments for maintenance and operating expenses upon the lands and water rights, but we are only concerned in that respect for the years 1935 to 1937 inclusive, which have not been paid. Prior to 1931 the plaintiff paid the annual maintenance assessments levied upon its lands and water rights which the defendant asserts it is now estopped from denying the legality of the liens of the defendant for the years 1935 to 1937 inclusive as the costs covered by the liens were agreed to by Mr. Sheppard who then represented all of the respective grantor companies of the plaintiff, and by so doing the position of the defendant has been changed in having made expenditures and improvements which otherwise it would not have made.

About December 24, 1937, the defendant instituted an action in the State District Court against the plaintiff to foreclose its claim of lien for unpaid assessments levied upon the lands here involved for the years 1935 and 1936, and also on December 24, 1937, instituted a similar suit there for the year 1937 assessments. A number of similar actions were also instituted in the State District Court to foreclose claim of liens of the defendant upon the lands and water rights which the defendant asserts that the present suit should be stayed until the actions in the State Court are there determined. The present suit was filed November 24, 1937, prior to the actions filed in the State District Court involving the assessments for the years 1935 to 1937, inclusive, and subsequent to the other actions.

■ The present suit being one to quiet title to the lands and water rights of the plaintiff and not to foreclose claim of liens of·the plaintiff, there are presented the following questions for solution:

(a) Can a suit to quiet title be maintained under the laws of Idaho where the plaintiff alleges that the defendant claims to have some interest in or claim of lien upon its lands and water rights which it asserts is subject and subordinate to its own claim and title thereto, and by reason of certain pretended assessments levied by the defendant upon its lands and water rights, the defendant claims a prior and paramount lien to the claim and title of the plaintiff?

The Idaho Statute relating to actions to quiet title, being Sec. 9-401, I.C.A., is broad and authorizes institution of an action to determine adverse claims of interest or liens to lands and water rights, and because the issue as to the priority of the claims of liens are involved would not defeat the right of the plaintiff to have removed from the public records, if tenable, its claim that the claim of lien of the defendant is subordinate to its claim and title in an action to quiet title.

That is the purpose of the statute to remove any adverse claim of whatever nature or cloud upon the title of the plaintiff. The present suit is not one in which there is involved the right or necessity to foreclose a lien of the plaintiff, but one questioning the validity of the claim of lien of the defendant which the plaintiff asserts is subordinate to and invalid as to its interest and title, and the validity and priority of the claims of the parties of any kind would properly be involved. The United States Courts have power and jurisdiction under the issues and facts to determine the relief prayed for.

■ (b) Do the actions pending in the State District Court abate the present action? It is thought not as the actions there instituted in December, 1937, involving the assessments for the years 1935 to 1937, inclusive were instituted subsequent to the bringing of the present action in November 1937, and therefore the present action should not be abated until the actions involving assessments for other years are determined in some other court, and, finally

(c) Whether the assessments levied as maintenance charges upon the lands and water rights of the plaintiff were valid, and if so, do the liens thereby created have a priority over the claims of lien and title of the plaintiff, and if not, is the plaintiff now estopped from questioning them by reason of the facts urged by the defendant? This is the principal and controlling question in the case.

The statute under which the defendant claims it was authorized to levy the assess-

ments is Section 41-1901, I.C.A. which provides: "Any corporation heretofore organized or any corporation that shall hereafter be organized for the operation, control or management of an irrigation project or canal system, or for the purpose of furnishing water to its shareholders, and not for profit or hire, the control of which is actually vested in those entitled to the use of the water from such irrigation works for the irrigation of the lands to which the water from such irrigation works is appurtenant, shall have the right to levy and collect from the holders or owners of all land to which the water and water rights belonging to or diverted by said irrigation .works are dedicated or appurtenant regardless of whether water is used by such owner or holder, or on or for his land; and also from the holders or owners of all other land who have contracted with such company, corporation or association of persons to furnish water on such lands, regardless of whether such water is used or not from said irrigation works, reasonable tolls, assessments and charges for the purpose of maintaining and operating such irrigation works and conducting the business of such company, corporation or association and meeting the obligations thereof, which tolls, assessments and charges shall be equally and ratably levied and may be based upon the number of shares or water rights held or owned by the owner of such land as appurtenant thereto or may be based upon the amount of water used; and such company, corporation or association of persons shall have a first and prior lien, except as to the lien of taxes, upon the land to which such water and water rights are appurtenant, or upon which it is used, said lien to be perfected, maintained and foreclosed in the manner set forth in this chapter; provided, that any right to levy and collect tolls, assessments and charges by any person, company of persons, association or corporation, or the right to a lien for the same, which does or may hereafter otherwise exist, is not impaired by this chapter."

It appears clear from the State statute that the defendant had the right where its system was for the purpose of furnishing water to its shareholders, to levy and collect from the holders or owners of land to which the water and water rights belong, regardless of whether water is used by the owner or not, reasonable assessment and charges for the purpose of maintaining and operating the works and conducting the business of the company or association and meeting the obligations thereof, which assessments and charges shall all be equally and ratably levied and may be based upon the number of shares or water rights held or owned by the owner or may be based upon the amount of water used.

While in the case of Aberdeen-Springfield Canal Co. v. Bashor et al., 36 Idaho 818, 214 P. 209, it was held that a party was not liable for maintenance unless the water is delivered, it was where they had contracted not to be liable for the assessment unless request was made for the water or it is delivered. No such contract appears here. So we are now confronted with the contention of the defendant that the assessments during the years 1935 to 1937 inclusive are valid liens upon the property which is not exempt for maintenance and operation charges under the particular facts in the present case. The essential facts out of which this question .arises have been referred to, but it may further be stated that when the Construction Company became insolvent there were outstanding $3,770,000 of bonds, and then the bondholders' committee was appointed. In lieu of foreclosure of the trust deed, there was turned over to the committee a majority of the capital stock of the Construction Company and all of the capital stock of its subsidiary, the Investment Company. In 1936, the steps were completed whereby in lieu of foreclosure, the bondholders obtained legal title to all the assets mortgaged and pledged under the trust deed. The balance of the stock of the Construction Company was then surrendered for the benefit of the bondholders. The Investment Company having been merged into the Construction Company and ceased to exist, the surviving company being the plaintiff which in connection with those proceedings changed its corporate name to the Idaho Farms Company, and the trust deed was then released. It will be remembered that all of the capital stock of the Construction Company was re-issued to the bondholders, evidencing their proportionate interest in the mortgaged and pledged assets. There are as appearing by "Exhibit 11" listed shares and the lands to which they are appurtenant which the plaintiff asserts it holds—until resale to other settlers—in the same status and under the same conditions as if it had never been sold, which situation arose by reason

of default on the purchase contracts by the settlers.

With the facts thus stated we approach the consideration of the legal principles urged by the plaintiff and the defendant.

The plaintiff contending that the case of Portneuf-Marsh Valley Canal Company et al. v. Brown & Chapin, Trustees, 274 U.S. 630, 47 S.Ct. 692, 71 L.Ed. 1243, completely controls the issues here presented, and is not distinguishable as it asserts that it "decides and establishes that after as well as before the foreclosure of the settlers' water contracts, a Carey Act Construction Company and its bondholders hold the repossessed property exempt from assessment liens of the operating precisely as it did before the unsuccessful sale to the settlers."

While on the other hand the defendant urges that the Portneuf-Marsh Case is distinguishable from the present one in that the property involved here comprises land and water rights acquired by foreclosure of existing settlers' water contracts or by quitclaim deeds in lieu of foreclosure and the lien of the construction company was terminated, and that the prior claim of lien of the plaintiff had by reason of the steps taken whereby it acquired the legal title to the property before the assessments here involved were levied, there was a merger of the legal and equitable title which extinguished the lien of the mortgage.

■ Of course, if the issues and facts of the Portneuf-Marsh Case are not distinguishable from the present case, the conclusion there reached is binding and decisive of the present case. What then were the status of the parties in the Portneuf-Marsh Case as compared with the status of the parties in the present case? It appears clear that in the Portneuf-Marsh Case the plaintiffs were trustees for the bondholders of the project and were seeking to foreclose a trust deed given by the Construction Company to the trustees to secure the payment of the bonds, and the usual facts were also alleged and relief prayed for as in ordinary actions to quiet title under the Idaho Statutes. The operating Company of the project, as here was made a party defendant.

The question there presented was one of priority of liens upon shares of stock representing water rights in an irrigation project engaged and created under the Carey Act. The suit was instituted in this Court for the foreclosure of a deed of trust by the trustees. The defendants were the construction company and operating company. The Construction Company entered into a contract with the State for the construction of the irrigation system to supply water to certain arid lands set apart for that purpose by the Federal Government under the Carey Act. The Construction Company under the contract should sell water rights in the system to the settlers. The system, when completed, should be transferred to the operating company in return for its capital stock. Under the contract the interest of the construction company in the system and lands within the project might be mortgaged in accordance with the Carey Act and the statutes of Idaho. Pursuant to the Statutes and the contract, the Construction Company sold water rights to the settlers and delivered to them a like number of shares of stock in the operating company. The interest of the purchasers in the lands and water rights and shares of stock should be security for the deferred installment payments. The operating company had power to levy all necessary tolls, charges and assessments. To finance the project, the Construction Company authorized a bond issue secured by the mortgage on the system. The contracts for the sale of water rights were deposited with the trustee as further security of the bonds. The Construction company defaulted in payment of interest on its bonds, and the suit was brought to foreclose the mortgage and any claims that the two companies might make to the land, water rights and stock. The operating company, as a defense, set up its ownership of some of the stock in controversy, acquired under a lien alleged to be superior to that of the mortgage which it asserted it was authorized to levy and collect as tolls, charges and assessments to defray the expenses of maintenance and operation of the system. There were two distinct classes of liens created with respect to the stock and water rights, in addition to the general mortgage lien on the whole system. First, The liens for maintenance and operating charges in favor of the operating company, and second, the purchase money liens in favor of the construction company on the stock and water rights on the entrymen land. The Court, when in commenting on the facts there said (page 694):

"Legislation permitting, a scheme for the creation of such a system might undoubtedly provide that liens for maintenance should take precedence over a general mortgage given to finance its construction. Such is the recognized order of priority in admiralty and to a more limited extent in receiverships in equity and in foreclosure proceedings. The trial court stated persuasively the contentions made here that hardship to individuals and danger to the unity and continuity of the system in event of foreclosure, if maintenance charges are not thus given the preference, are considerations which might well turn the scales in favor of that class of liens if the statutes, or the controlling documents in the absence of statutory provision, were silent or ambiguous.

"But we think the statutes here are neither silent nor ambiguous. Reading together the documents embodying the plan of organization, which specifically incorporated the provisions of the statutes, the question may be resolved without exclusive reliance upon implications to be found in the general nature and purpose of the plan itself.

"The Carey Act as amended declares: 'A lien or liens is hereby authorized to be created by the State to which such lands are granted and by no other authority whatever, and when created shall be valid on and against the separate legal subdivisions of land reclaimed, for the actual cost and necessary expenses of reclamation and reasonable interest thereon.' * * * This statute is an enabling act, empowering the state to provide for liens by appropriate legislation. The construction of state statutes so enacted, and the status of liens created under them are local questions (Equitable Trust Co. v. Cassia County (C.C.A.) 5 F.2d 955) which, in the absence of controlling authority by the highest court of the state, we must determine for ourselves. Risty v. Chicago, R. I. & Pac. Ry. Co., 270 U.S. 378, 46 S.Ct. 236, 70 L. Ed. 641. By the act of the Idaho Legislature accepting the benefits of the Carey Act (section 3019 Comp.Stat.1919), it is provided:

" 'Any person, company, or association, furnishing water for any tract of land, shall have a first and prior lien on said water right and land upon which said water is used, for all deferred payments for said water right; said lien to be in all respects prior to any and all other liens created or attempted to be created by the owner and possessor of said land; said lien to remain in full force and effect until the last deferred payment for the water right is fully paid and satisfied according to the terms of the contract under which said water right was acquired.'

"The construction company was a company furnishing water within the meaning of the section, and the liens for the deferred payments now asserted by respondents are liens in its favor, authorized by the statute and reserved by its contracts with the purchasers. But it is argued, notwithstanding the broad language of the statute, that its application is limited by the second clause: 'Said lien to be in all respects prior to any and all other liens created or attempted to be created by the owner and possessor of said land.' It is insisted, as the district court held, that by reason of this clause the liens to secure deferred payments do not take priority over the liens for maintenance because the latter are not liens created by the land owners, which alone are subordinated to the purchase contract liens.

"But we think the quoted clause cannot be thus narrowly construed. It is not in terms a limitation on the general language of the section but an amplification of it. Its apparent purpose is to make certain that entrymen, in the process of acquiring their lands and making the water rights appurtenant to them, may not by any legal device create liens which shall come ahead of the purchase contract liens given to secure the deferred payments. The clause provides that the authorized liens on the water rights and lands shall have priority over all liens created by the landowners themselves, but that is not equivalent to saying that they shall be prior to no others. It is of course an implied term of every lien statute that the lien authorized is subordinate to liens for taxes. Continental & Commercial Trust & Savings Bank v. Werner, 36 Idaho, 601, 602, 215 P. 458. If the meaning here contended for were given to the statute, liens for the unpaid purchase price would be subject to subsequent materialmen's and mechanics' liens and those of attachment and levy of execution. The statute obviously could not be so interpreted without thwarting its plain purpose and destroying its effective operation.

"Its primary object was to secure the requisite capital for the creation of costly irrigation systems by which arid public

lands could be brought under cultivation. It could not have been contemplated that the 'first and prior' liens authorized by the statute to secure the repayment of such capital should be subsequent to every other lien which might be placed upon the property except those formally executed by the landowners or that a 'first lien' of that character would attract capital into a new and hazardous enterprise. The concluding clause of the section, 'said lien to remain in full force and effect until the last deferred payment * * * is fully paid and satisfied,' can only mean that the liens for purchase money which were first when created, remain so despite maintenance liens which may later come into operation as a result of the nonpayment of assessments.

"The provisions of the various instruments for establishing the irrigation system, while not explicit, are entirely consistent with the view which we take of the meaning and effect of the statute. The contract between the two companies provided in substance, as did the by-laws of the operating company specifically (article 5, § 8) that all shares of stock 'shall be held subject to the rights of' the construction company 'until the amount due such company, its successors or assigns, shall have been fully * * * paid, as provided in the contract between said corporation and the purchaser of shares. * * *'

"We therefore conclude that the contract liens are superior to the maintenance liens asserted by petitioner, a conclusion which makes it unnecessary for us to consider the validity of the maintenance liens challenged by respondents."

Portneuf-Marsh Valley Canal Company v. Brown et al., Trustees, 274 U.S. 630, 636, 637, 638, 639, 640, 47 S.Ct. 692, 71 L.Ed. 1243.

■ It will be observed from a study of the opinion of the Supreme Court, the opinions of the trial court and the Circuit Court of Appeals, the briefs and record, the nature of the action was the foreclosure of the bonds and prayer that the construction and operating companies set up any interest or claim they may have in and to the properties which were adverse to the bondholders who claimed a prior mortgage lien. Also the same Carey Act, statutes of the State, and similar contracts and proceedings were had relative to the status of the properties and

parties, and the liens held by the construction company created by sales of water rights, some of which were foreclosed, and the properties acquired through Sheriff's deed, and some by quitclaim deeds given to the construction company in lieu of foreclosure, as involved here. The deeds there were taken in the name of Peabody as agent for the bondholders and their trustees, while here the quitclaim deeds were taken in the name of the Investment Company. The situations are the same. Under those circumstances it was contended by the operating company that the foreclosure proceedings and quitclaim deeds operated to extinguish the Carey Act construction company's lien for construction charges, and that thereafter the property thus acquired and held became subject to maintenance liens precisely as any other land and water right of the project. The issues presented and decided and the status of the respective parties are identical in every respect, and that being the case the Supreme Court having decided that after as well as before the foreclosure of the settlers' water contracts, a Carey Act construction company and its bondholders hold the repossessed property exempt from assessment liens of the operating company precisely as it did before the unsuccessful sale to the settlers, it is decisive of the present case, unless the plaintiff is estopped by its conduct from maintaining the position which it now takes and have waived its right to invoke the principle recognized by the Supreme Court exempting its property from maintenance and operating charges. The Court did not there regard under such circumstances that there was a merger of the legal and equitable title, or a change of situation of the parties, but recognized the priority of the lien of the general mortgage and reached that conclusion. One would reason from the conclusion there stated and reached by the Supreme Court exempting the property and water rights from maintenance and operating charges that such exemption would cease to exist when the full amount of the bonds are satisfied.

The doctrine of estoppel is invoked by the defendant as it asserts that the evidence discloses that the plaintiff and its agents paid maintenance assessments upon the properties up to and including the year 1931, and that Mr. Sheppard, who was the general manager of the defendant and the manager of the Land and Water Company and of the

Investment Company, and representative of the Bondholders' committee looked after all their interests and managed those companies which were finally merged in the plaintiff and that he participated in the preparation of the defendant's budget and recommended certain improvements should be made on the system and the purchase of storage and other water rights.

Since 1931 the plaintiff has paid no maintenance assessments upon the property, and no water was delivered or used upon the lands involved.

■ The defendant was required under the law to spread the assessments ratably over all the lands of the project regardless of the contention of the plaintiff and until its liability was ultimately determined. Applying then the doctrine of equitable estoppel as recognized by the Supreme Court of the State and which is the general rule: "In order to apply the principle of equitable estoppel it is essential that the party claiming to have been influenced by the conduct or declarations of another to his injury was himself ignorant of the facts in question, and also without any convenient and available means of acquiring such knowledge. Where the facts are known to both parties or both have the same facilities for ascertaining the truth, there can be no estoppel." Cahoon v. Seger, 31 Idaho 101, 168 P. 441; Johansen v. Looney, 31 Idaho 754, 176 P. 778. There must be a false representation or concealment of material facts to one without knowledge. Sullivan v. Mabey, 45 Idaho 595, 264 P. 233. A misconstruction of the legal effects of acts where the parties stand on equal terms cannot be a basis of an equitable estoppel. National Surety Co. v. Craig et al., 94 Okl. 63, 220 P. 943.

■ It is further urged by the defendant that the plaintiff has abandoned its right to water for the lands in question and bases its contention on the fact that there has been a failure for more than five years to apply the water rights to plaintiff's lands. The evidence shows that the water appurtenant to the lands has at all times been used by the defendant on lands within its system under irrigation and to which the defendant has been delivering water which would not create any abandonment or forfeiture of the right. Joyce et al. v. Murphy Land & Irrigation Company et al., 35 Idaho 549, 208 P. 241; In re Department of Reclamation of State of Idaho, In re Enoch et al., 50 Idaho 573, 300 P. 492.

■ The five year term statute of the State being Section 41-216, I.C.A., provides that when such right is lost through non-use it shall revert to the State and be again subject to appropriation. The statute does not provide that in case a given water right be not used on any land to which it belongs, the right shall be lost, as it merely provides that the right shall be lost when it is not used at all. The water right appurtenant to the plaintiff's land is but a part of the entire water right and was appropriated by the Twin Falls North Side Land and Water Company for use on all of the entire North Side Project, and there has been no failure to apply it to a beneficial use for the irrigation of the entire project. The statute was not intended to apply to settlers within a Carey Act project who were not themselves the appropriators of the water from the public stream of the state. One would assume that the defendant is not interested in having the water revert to the state but are in hope of having the water abandoned to it so that it can become the owner thereof which the law does not recognize. Watts et al. v. Spencer et al., 51 Or. 262, 94 P. 39.

■ If no public interest is favored by the abandonment, equity is against declaring a forfeiture. It is a question of intention and must be evidenced by a clear and decisive act. Hurst v. Idaho-Iowa Lateral & Reservoir Company et al., 42 Idaho 436, 246 P. 23; Sullivan Construction Company v. Twin Falls Amusement Company, 44 Idaho 520, 258 P. 529; St. John Irrigating Company v. Danforth et al., 50 Idaho 513, 298 P. 365; Union Grain & Elevator Company v. McCammon Ditch Company, 41 Idaho 216, 240 P. 443.

The evidence is lacking in proof of any intention of the plaintiff to abandon its water right. The relationship of the parties was of a fiduciary nature and the defendant cannot properly urge that the water rights in question have passed to it. They do not hold adversely against the other as a trust relationship exists and their own right is an interest in common. 65 C.J. Sections 277, 278.

No controversy exists here between prior and subsequent appropriations on the river.

■ Lastly, it is urged that the defendant has an equitable lien for the maintenance assessments. Under the evidence there is no proper basis for such a contention. The lands in controversy were not irrigated and received no water from the system during

the years for which maintenance assessments are claimed. Certain improvements were made on the system since the defendant acquired it which were outside the ordinary expense of delivery of water and maintenance of the system. No evidence appears showing the amount of such improvements done in the aggregate during the entire three year period in question, as the evidence shows that during a period extending over approximately ten years the defendant has engaged in making improvements and that in 1935 it acquired 20,000 acre feet of additional capacity in the American Falls Reservoir. The defendant and its stockholders have for many years used the water represented by the stock in controversy which was a benefit derived by them and has from the status of the plaintiff's property and the large amount paid in previous years, derived advantages far in excess of any equitable benefits conferred. A consideration of the record and opinions of the courts in the Portneuf-Marsh Case the equitable lien aspect of the controversy was considered and disposed of, and it was there asserted that large sums of money had been expended in the improvement of the system. It would be stretching the imagination to say that under the evidence the equities are in favor of the defendant. So the contention that the plaintiff had abandoned its water right is not tenable under the evidence.

In view of the conclusions thus reached the relief prayed for in plaintiff's complaint must be granted with costs.