FIRST NAT. BANK OF ALEX, OKLA., et al. v. SOUTHLAND PRODUCTION CO. et al. (two cases).

Nos. 27260, 27261. March 18, 1941.

Rehearing Denied May 6, 1941.

*112 P. 2d 1087.*

10

Spielman, Cantrell & McCloud, of Oklahoma City, for plaintiffs in error.

William C. Lewis and George E. Massey, Jr., both of Oklahoma City, for appellee and cross-petitioner United States.

C. D. Cund, Thomas H. Owen, and Albert D. Lynn, all of Oklahoma City, for appellee and cross-petitioner Oklahoma Tax Commission.

Gordon Fuller, of Oklahoma City, and Frank Field, of Washington, D. C., for appellees and cross-petitioners Jack B. White and T. H. White.

Roddie & Beckett, of Oklahoma City, for defendants in error and cross-petitioners O. T. McNeil and others.

OSBORN, J. This is an appeal from a judgment of the district court of Oklahoma county in causes No. 88307 and No. 88320, consolidated for trial in that court.

In cause No. 88307, the Southland Production Company, an express trust, through its trustees, hereinafter referred to as plaintiff, sued the Olympic Refining Company for a balance due on an open account in the sum of $943.18. Plaintiff petitioned the court for appointment of a receiver. The receiver was appointed and took charge of certain property of defendant.

It appears that defendant Olympic Refining Company, located at Oklahoma City, was engaged in the business of refining and marketing crude petroleum and its products. Certain motor fuel taxes were due the State of Oklahoma and to the United States Government. The Oklahoma Tax Commission and the Collector of Internal Revenue of the United States had issued tax warrants which were levied upon certain tank cars of oil involved in this action, and under said warrants the sheriff of Oklahoma county took possession of said cars of oil.

The First National Bank of Alex and L. O. Carter instituted a replevin action in the district court, which is cause No. 88320, against the sheriff for recovery of possession of the cars of oil and oil prod-

ucts herein involved. The bank and Carter also intervened in cause No. 88307, and for convenience will be hereinafter referred to as interveners. The trial court entered an order requiring the sheriff to deliver possession of the cars of oil to the receiver of defendant Olympic Refining Company, which order was issued over the protest of the First National Bank of Alex and L. O. Carter.

Other parties intervened in the action, including the State of Oklahoma and the United States claiming taxes for motor fuel sales, and laborers seeking to establish and foreclose laborers' liens.

The interveners, First National Bank of Alex and L. O. Carter, contended that there was a sale of the property involved herein by defendant Olympic Refining Company to Carter and a mortgage executed by him to the First National Bank of Alex, and as a result of said transaction the bank had a lien upon the property superior to the liens of the other parties asserting claims against the Olympic Refining Company. The trial court held that the sale was void and as a consequence the mortgage to the bank was likewise ineffective, and that the bank was only a general creditor of the Olympic Refining Company. Joined in a cross-appeal are the Oklahoma Tax Commission and the United States, and various labor claimants appealing only from the order of payment of the various claims. The contentions of the First National Bank of Alex and L. O. Carter will be considered first. The circumstances under which they lay claim to the property involved herein are as follows:

The Olympic Refining Company was handling most of its sales of its products through L. O. Carter, an individual doing business at Tulsa, Okla., as L. O. Carter Company. The Olympic Company did its banking business with the First National Bank of Alex, Okla. Its affairs were practically all handled by Leslie Cole, the manager of the company. The manager would draw up invoices of carloads of its refined products and attach a draft drawn upon L. O. Carter, and deposit same in the First National

Bank of Alex to the credit of the Olympic Refining Company. The Alex Bank would then send the drafts with invoices to the First National Bank at Tulsa for collection from L. O. Carter. When Cole of the Olympic Company deposited these drafts with the Alex Bank, that bank would immediately give the Olympic Company credit on its checking account for the amount. The Alex Bank would allow these drafts to remain in the Tulsa Bank until Carter took them up, which usually was only when Carter sold the products which were represented by the draft and invoice. As a result, there accumulated an advancement by the Alex Bank to the Olympic Company of over $11,000. This practice had existed from July to September, 1935.

It appears that about the middle of September the cashier of the bank, Mr. Grady Harris, became aware that the bank had advanced more money to the refining company than banking regulations permitted. Said cashier met Leslie Cole, the manager of the company, and L. O. Carter, on September 23, 1935, for the purpose of effecting some arrangement to relieve the condition occasioned by nonpayment of the drafts. It is shown that the manager of the refining company offered to give a chattel mortgage to the bank on certain carloads of oil which it owned which were upon the freight yards in Oklahoma City. This was unsatisfactory to the bank because it would not result in reducing the amount of the advancements from the bank to the company, which were already excessive. It was finally agreed between the three parties that Carter would buy all of the products of the refining company and would in turn give his promissory notes and chattel mortgage to the bank upon the carloads of oil hereinabove referred to as security for the payment thereof. The amount of said notes was $4,949.61, and of said amount $3,122.79 was credited to the account of the refining company, thereby reducing its indebtedness to the bank in said amount, and the sum of $1,823.82 was loaned from the bank to the refining company for the purpose of paying taxes

then due the Oklahoma Tax Commission. It does not appear that any consideration was paid by Carter to the refining company nor did he receive any portion of the proceeds of the notes hereinabove referred to. The good faith of the transactions related is not questioned, legal fraud only being relied on to assert invalidity.

The trial court found, and it is argued here, that the sale to Carter was violative of the provisions of section 10008, O. S. 1931, 24 Okla. St. Ann. § 6, which is as follows:

"Every transfer of personal property other than a thing in action, and every lien thereon, other than a mortgage, when allowed by law, is conclusively presumed, if made by a person having at the time the possession or control of the property, and not accompanied by an immediate delivery, and followed by an actual change of possession of the things transferred, to be fraudulent and therefore void, against those who are his creditors while he remains in possession, and the successors in interest of such creditors, and against any person on whom his estate devolves in trust for the benefit of others than himself, and against purchasers or incumbrancers in good faith subsequent to the transfer."

In the findings of the trial court it appears that this arrangement between the company, the bank, and Carter is broken down into two separate transactions, it being held that the sale to Carter was void since there was no change of possession of the property sold, therefore the mortgage executed by him to the bank was likewise void; but, as we see it, the transaction between the refining company, the bank, and Carter was a single transaction. There was not, in a strict sense of the word, a sale of the property to Carter within the meaning of that term as used in section 10008, O. S. 1931, 24 Okla. St. Ann. § 6; but viewing the transaction as a whole, it is apparent that Carter was selected by the refining company and the bank as an intermediary or agent for the purpose of executing a mortgage which was designed to furnish protection to the bank and to relieve the situation created by the excessive indebtedness of the refining company to the bank. As a part of the same transaction Carter was appointed an agent for the bank to proceed to sell the carloads of oil upon which the mortgage was given and upon the sale thereof was to transmit the proceeds to the bank to be applied upon the notes which he had executed to the bank for the debt of the refining company. Summarizing, we are driven to the conclusion that the whole purpose of the transaction was to give to the bank, which had advanced the money for the operation of the business, a certain priority over the other creditors of the refining company which, under the provisions of the applicable statutes, is expressly authorized. Said statute, section 10012, O. S. 1931, 24 Okla. St. Ann. § 11, is as follows:

"Any person in this state indebted to other persons shall have the right to prefer one or more of such creditors in good faith to secure a valid debt, which preference may be manifested by payment, by mortgages, either real or chattel, or by the transfer of personal property or real estate, and if received by the creditor in good faith, such conveyance or mortgage shall be valid in the hands of the mortgagee and constitute a preference to the extent thereof, subject to the laws relating to the filing and recording of mortgages."

The fact situation to which we have just referred is somewhat analogous to the facts involved in Iowa National Bank v. Citizens National Bank, 70 Okla. 1, 172 P. 924, wherein it was held:

"Where the owner of personal property, without fraud, executes a bill of sale therefor to another, said bill of sale being executed without consideration, and for the purpose of procuring money for the owner, the owner of the property retaining the actual possession of the property, and the one to whom such a bill of sale is made, with the knowledge and approval of the owner of the property, executes a mortgage upon the property, and the proceeds resulting from the sale and assignment of said mortgage is delivered to the owner of the property, such mortgage is a prior lien on said property to that of a mortgage subsequently executed by the owner of said property to secure a past indebtedness,

where the mortgagee of said subsequent mortgage at the time of taking said mortgage from the owner of said property had actual knowledge of the prior mortgages, and the manner in which the same were brought about."

The above rule has been free from criticism except in those cases where effort was made to apply it outside of the field of its intended operation. It is evident that effort has been made to use this authority in support of the minority rule that the recording of a chattel mortgage by a stranger to the title thereof constitutes notice to subsequent purchasers and incumbrancers of said property. See People's Finance & Thrift Co. v. Shirk, 181 Okla. 418, 74 P. 2d 379, wherein the court discusses the Texas cases of Rhea Mortgage Co. v. Lemmerman (Tex. Com. App.) 10 S. W. 2d 690, and Southwest Security Co. v. Jacques (Tex. Com. App.) 42 S. W. 2d 232. Therein this court follows the rule supported by the overwhelming weight of authority to the effect that the filing of a chattel mortgage on personal property by a stranger to the title thereof is void as to a subsequent bona fide purchaser. Such is not the question decided in the case of Iowa Nat. Bank v. Citizens Nat. Bank, supra.

In the instant case it must be conceded that the Olympic Refining Company could have executed a chattel mortgage on the property herein involved to the bank which would have been valid and binding upon all the parties herein involved. Section 10012, O. S. 1931, 24 Okla. St. Ann. § 11, supra; Nix v. Underhill, 8 Okla. 123, 56 P. 959; Smith-McCord Dry Goods Co. v. John B. Farwell, 6 Okla. 318, 50 P. 149; Cobbey on Chattel Mortgages, sec. 780, page 1010. Generally, a person may do through an agent whatever he is empowered to do in his own proper person. McNulty v. Dean, 154 Wash. 110, 281 P. 9, 66 A. L. R. 1417; 2 Am. Jur., Agency, sec. 22, page 24; 2 C. J. S., Agency, sec. 11, page 1039. Since the Olympic Refining Company had a right, fixed by statute, to prefer the bank as a creditor by the execution of a mortgage upon its property, it necessarily follows that it could execute such mortgage through an agent or intermediary and that said mortgage would have the same identical force and effect as if it had been executed by said company. Such is one of the fundamental principles of agency and such is the rule announced in the case of Iowa Nat. Bank v. Citizens Nat. Bank, supra.

The finding of the trial court that there was a sale of the property to Carter, and a subsequent mortgage thereof to the bank, is not supported by any competent evidence for the reason that no consideration passed from Carter to the Olympic Refining Company and none of the proceeds derived from a loan passed from the bank to Carter. It is true that after the transaction was closed he announced to the railroad company, the bailee of the property, that he was the owner thereof and subsequently exercised some dominion over said property, but this was pursuant to the agreement and understanding that he should proceed to dispose of the property at the earliest possible date and should procure funds from the sale thereof, which funds were to be transmitted to the bank and used to reduce the indebtedness, which was the indebtedness of the Olympic Refining Company and not the indebtedness of Carter, notwithstanding the fact that the evidences of such indebtedness were executed by him.

We are not here concerned with the rights of subsequent purchasers or incumbrancers of the property covered by the mortgage. The claims asserted by the other parties herein were for indebtness which had accrued prior to the execution of the mortgage herein involved. It is not shown that any of said claimants were deceived, misled, or were induced to change position by virtue of the chattel mortgage herein involved. There is involved herein nothing more nor less than a preference of a creditor, an attempt to secure the bank which had furnished the funds upon which the Olympic Refining Company had operated. Such preference is specifically authorized by statute; therefore, the other creditors are without lawful grounds of complaint.

It is thus clear that the chattel mortgage held by the bank constitutes a valid

and first lien, and that the trial court erred in holding same void.

We will next consider the contentions of the United States Government, the State Tax Commission, and the various labor claimants as to the priority of their claims as found by the trial court insofar as there are contentions of error.

The trial court held that the various claims, including state and United States Government excise taxes, be paid in the following order:

(1) The claim of Oklahoma Tax Commission ----------------------------------$1,286.28

(2) The claim of United States for taxes --------------------------------------$1,225.99

(3) The claim of labor claimants, total ------------------------------------------$986.07

(4) The claim of United States for taxes --------------------------------------$1,629.67

(5) The claim of Oklahoma Tax Commission ----------------------------------$427.22

It is the contention of the United States that it has a prior lien for all unpaid taxes, subject only to the lien of the State of Oklahoma in the sum of $1,286.28, which is in accord with the finding of the trial court, except as to place the government's lien for the sum due on its second seizure for the taxes in the sum of $1,629.67 ahead of the second assessment of lien for the State of Oklahoma and for labor.

It is the contention of the Oklahoma Tax Commission that the State of Oklahoma is entitled to have both its claims for taxes reported, the $1,286.28, and for taxes unreported at the time of the seizure in the sum of $656.72, allowed as one claim and decreed to be prior to all other claims.

We will first consider the contentions of priority of liens as they relate to the State of Oklahoma and the United States Government.

The record shows that in October, 1935, the Olympic Company filed its report for September with the Oklahoma Tax Commission, showing a tax liability of $1,-286.28. Payment was not made at the time required, and on October 9, 1935, the Oklahoma Tax Commission issued a tax warrant for the enforcement of the payment of that sum, under the authority of section 12573, O. S. 1931, para. (b). This warrant was delivered to the sheriff and a levy made the same day upon 36 cars of refined products, it being the same property described in the mortgage given by Carter to the Alex Bank.

On October 11, 1935, a warrant was issued by the United States Government, and on the same day a levy upon the same property made by the government for taxes due it for September and October, 1935.

On October 12, 1935, a receiver was appointed for the Olympic Company, and by order of the court the possession of the property levied upon was turned over to the receiver.

On November 1, 1935, notice of demand for taxes due for August, 1935, was mailed by the government to the Olympic Company in the sum of $1,-629.67, and a copy of same filed with the clerk of the federal district court and the district court at Oklahoma City on November 2nd.

On December 5, 1935, at the time of the trial of the cause, the Oklahoma Tax Commission filed a supplemental petition alleging that in addition to the sum of $1,286.28 formerly stated it had discovered $656.72 additional due for taxes for the same period of time, but that the Olympic Company had neglected and failed to report the same. No tax warrant was issued therefor. This sum with costs and penalty was likewise asked to be made a prior lien and claim upon the property.

It is the contention of the government that the State of Oklahoma made no seizure on its second assessment in the sum of $656.72, and that no claim for same was filed until December 5, 1935, and that both of the government's claims would be superior to the second assessment of the state, even though this court should decide that the creation of the

liens of the government, of the state, and of the laborers and the determination of their priorities are not dependent upon recording or proceedings taken for their foreclosure, but rests entirely upon the dates of their accrual.

It is the contention of the Oklahoma Tax Commission that the additional claim of $656.72 is only a part of the first claim filed by the state; that the taxpayer reported the taxes due for September, 1935, to be $1,286.28 and that was the amount for which the tax warrant was issued, but the report of the auditor disclosed that the additional sum of $656.72 was due for the same month; that the tax warrant and seizure of the property was made to enforce the payment of the September taxes due and that it should be held to cover the correct amount of such taxes without regard to the amount actually reported to be due by the taxpayer. It is contended that to hold otherwise would result in penalizing the State of Oklahoma in causing it to lose its priority by reason of the neglect and failure of the taxpayer to report the correct amount of tax due in the first instance. The United States Government, which hereinafter will be referred to as the government, admits that its lien for each of its two assessments could not possibly accrue under the statute until October 11, and November 1, 1935, the respective dates that the Collector of Internal Revenue received the assessments against the Olympic Company and issued its notice to and served the collector's warrant upon said company. It is admitted that a receiver was appointed by the court on October 12, 1935, and that an order was issued by the court on October 14, ordering the property to be surrendered to the receiver, and that all of the property seized was surrendered to the receiver on October 15, 1935.

It is contended by the government that no tax warrant was ever levied by the Tax Commission against the property of the Olympic Company for the $656.72, the last amount found to be due for taxes for September, 1935, but the government did have served upon the receiver a warrant of distraint for its last assessment.

Since the property had been turned over to the receiver by order of the court prior to the dates the Oklahoma Tax Commission or the government presented their claims for their second amount claimed for taxes, we think it immaterial whether or not either served their warrant on the receiver, and that such service could not be relied upon for a basis of priority, insofar as the government and State of Oklahoma are concerned.

It might be stated as a general rule, both under the state and federal statutes, that different liens on the same property have priority according to the time of their respective creation and perfection, other things being equal. Bank of Quapaw v. Denney, 98 Okla. 279, 225 P. 362; Portneuf-Marsh Valley Canal Co. v. Brown, 274 U. S. 630, 47 S. Ct. 692, 71 L. Ed. 1243. But a general rule cannot always prevail against a special statute.

Let us review some of our state statutes pertaining to the right and priority of the state in enforcing the lien for excise taxes due in the instant case.

Section 12558, O. S. 1931, 68 Okla. St. Ann. § 690, provides:

"(a) Every distributor shall make and transmit to the Oklahoma Tax Commission, on or before the fifteenth day of each calendar month, upon forms prescribed and furnished by said commission, a report, under oath, showing the quantity of motor fuel sold, distributed or used by such distributor, within this state, during the preceding calendar month, and showing such other facts and matters as the said commission may require.

"(b) Every distributor, at the time of making the monthly report above mentioned, shall pay to the Oklahoma Tax Commission the amount of excise tax due for the month covered by such report."

It is conceded in the brief of the government that under the provisions of this section and section 12561, O. S. 1931, 68 Okla. St. Ann. § 693, relative to making reports to the Oklahoma Tax Commission, they operate to vest in the State of Oklahoma a lien upon all of the property of its agent, the refinery, or distributor,

for his failure to remit to the Tax Commissioner the taxes so collected for the state. Let us then determine when the lien of the state sets up and what is necessary to put the lien in effect.

Section 12573, O. S. 1931, as amended in section 13, chapter 111, Session Laws of 1933, 68 Okla. St. Ann. § 705, provides:

"(a) All excise taxes, penalties and costs accruing to the State of Oklahoma against any distributor or against any retailer or retail dealer, shall be a first and paramount lien upon all of the personal property of such distributor or such retailer or retail dealer devoted to or used in his business as such, and a lien superior to any subsequent lien, upon any and all other property both real and personal, in the State of Oklahoma, not exempt under the Constitution of the state, which lien shall date from the date upon which the tax became due and delinquent . . ."

Under the provisions of this section, the lien of the state set up on the 7th day of October, 1935, when the distributor, the Olympic Company, made its report for taxes due for September, 1935, but failed to pay any part of same. The lien covered all of the property of the Olympic Company, including the property in controversy here, and such lien did not depend for its existence and priority upon the issuance of a warrant, or seizure of the property under the warrant. The existence of the lien not depending upon the issuance of the warrant or the seizure of the property for the taxes then due would extend to and include the $656.72 last reported due, as well as the $1,286.28 for which the warrant was issued and seizure made. The issuance of the warrant and the seizure of the property performed no function in the creation of the lien, but was only the primary step in the procedure for the collection of the taxes from the property upon which the prior lien had attached.

In addition to the above quoted statutes, section 12565, O. S. 1931 (as amended by sec. 8, ch. 111, S. L. 1933) 68 Okla. St. Ann. § 697, provides for a special lien of the state in cases of bankruptcy and receivership proceedings, and provides:

"When the property of any person shall be seized in any mesne or final process of any court of this state, or when the business of any such person shall be suspended, by the action of creditors, or put into the hands of any receiver, assignee or trustee or when any such person shall file a petition in bankruptcy or against whom bankruptcy proceeding may have been commenced, then, in any and all such cases, the excise tax due by such person to the State of Oklahoma shall be considered as a first and paramount claim, and the state shall in such cases have a first and paramount lien thereon."

The government cites section 115, title 26, U. S. C. A. (Revenue Act 1928, sec. 613, 26 U.S.C.A., Int. Rev. Acts, page 461) in support of its contention that its lien is superior to all liens herein, except the lien of the state for the $1,286.28, the original sum for which warrant was issued and seizure made under same for the state. It provides:

"Lien for Taxes. (a) If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, penalty, additional amount, or addition to such tax, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person. Unless another date is specifically fixed by law, the lien shall arise at the time the assessment list was received by the collector and shall continue until the liability for such amount is satisfied or becomes unenforceable by reason of lapse of time.

"(b) Such lien shall not be valid as against any mortgagee, purchaser, or judgment creditor until the notice thereof has been filed by the collector."

Section 191 of title 31, U. S. C. A., provides:

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executor or administrator, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied. . . ."

This section was section 3466 of the Revised Statutes of the United States. It

has been frequently interpreted and held not to create a lien on the property of the creditor. United States v. State of Oklahoma, 261 U. S. 253, 43 S. Ct. 295, 67 L. Ed. 638. In Spokane County v. United States, 279 U. S. 80, 73 L. Ed. 621, 49 S. Ct. 321, the question of priority of the United States for income tax and the State of Washington for personal property tax was before the court. The taxpayer was insolvent and a receiver had been appointed. The court held:

"Under U. S. Rev. Stat. sec. 3466, requiring debts to the United States to be first satisfied if the debtor is insolvent, taxes levied by the United States, after the property of the insolvent passes into the hands of a receiver, have priority over state taxes subsequently levied and those levied before the property goes into the receiver's hands, if the proper statutory steps have not been taken to fix a lien upon the property prior to that time."

It is the insolvency that causes the section to go into being or effect insofar as the claim of the government is concerned, and it is shown in the instant case that prior to such insolvency the lien of the state for all reported and unreported tax was perfected under the provisions of section 12565, supra, causing the lien to attach on October 7, 1935, when the Olympic Company made a partial report to the Tax Commission as to the taxes then due the state.

In Re Caswell Const. Co. (D. C. N. Y. 1936) 13 Fed. 2d 667, the court said, in part:

"Whatever be the law as to the status of taxes of the United States as an attribute of sovereignty or as existing at common law, it is clear that the United States may limit its priority by statute, when it does so expressly and this it has done by sections 3466 and 3186 of the Revised Statutes (Comp. St. secs. 6372 and 5908) and sections 64a and 67d of the Bankruptcy Law."

Section 3466, referred to, is section 191 of title 31, U. S. C. A., supra, relative to insolvency estates.

In Gerson, Beesley & Hampton, Inc., v. Shubert Theater Corp. et al. (D. C. So. Dist. of N. Y.) 1934, 7 Fed. Supp. 399, wherein there was a contest as to the priority of federal and state claims for taxes, the court said:

"It is clear, therefore, that if the question of priority, as between the two governments, depends on the comparative dates when their respective liens on the property of the corporation had their inception, then the state comes ahead, because it is conceded that the $81,000 proceeds of sale of the property now held by the receiver stands in the place of the property."

To the same effect is the holding of the court in City of Winston-Salem v. Powell Paving Co. et al. (D. C. North Carolina 1934) 7 Fed. Supp. 425.

The government contends that before the lien for the $656.72 will benefit the State of Oklahoma, it must be made perfect and specific. We find nothing in the case of New York v. Maclay, Rec'r, 288 U. S. 290, 53 S. Ct. 323, cited by the government which would be controlling in the instant case. The court in that case held that the lien for taxes to the State of New York might be good as against purchasers and mortgagees, but not against the United States under the priority statute; that as against the United States it was nothing but an inchoate and imperfect lien, designated by the court as "merely . . . a caveat of a more perfect lien to come." The priority of the government was based upon the fact that no distraint or seizure had been made. As has been shown herein, prior to the date that the Olympic Company was adjudged insolvent, which would put the priority statute into action, and before the government perfected its lien for the first assessment on October 11, 1935, the Oklahoma Tax Commission issued a tax warrant and a levy was made by the sheriff on October 9th for the September taxes due the state. Under the very decisions relied upon by the government, the lien of the State of Oklahoma was perfected and made specific and which is admitted by the government, but such admission is confined to the amount of taxes actually reported as being due by the Olympic Company. Since under the provisions of section

12573, O. S. 1931, as amended by chapter 111, S. L. 1933, 68 Okla. St. Ann. § 705, supra, the lien of the state was made a first lien and to date from the date upon which the taxes became due and delinquent, and since the lien extended to all of the taxes due, whether reported or unreported and the additional sum found to be due for the same period of time, we must conclude and hold that it consisted of a single tax and one lien and was perfected and the right of the state set up when the single levy was made without any additional seizure of the property. The receiver being duly notified by the Tax Commission of the extra sum found to be due for September, we can see no good reason why the entire claim should not be paid as one prior claim when disbursement is made. We must therefore conclude that the trial court committed error in not holding that the lien for all of the taxes due the state from the Olympic Company for the month of September was prior and superior to the lien of the United States for taxes due it.

It is the contention of the Oklahoma Tax Commission that the taxes due the state by the Olympic Company for both amounts found to be due for September, 1935, are entitled to priority over the claims of the laborers filed herein.

It is contended on the part of the labor claimants O. T. McNeil, J. W. Miller, Donald Pierce, L. Lingerfoot, Bob Mahoney, E. Hall, J. J. Crew, J. E. Holmes, and J. D. Brown, interveners herein, that their claims for labor are based upon sections 11007 and 11011, O. S. 1931, which provide for a lien on the production of their labor and for priority thereof. It is further contended that the statutes under which the State of Oklahoma claims its lien are in violation of section 57, article 5, of the State Constitution and void, and if not void, no tax is due the state and no basis exists for a lien. That if the state ever had a lien, it waived same by taking other security for taxes.

Claimants Jack B. White and T. H. White concur in the contentions of the United States Government as to the priority of liens.

Let us review some of the labor lien statutes as interpreted by the court. Section 11007, O. S. 1931, 42 Okla. St. Ann. § 92, provides that where laborers perform work under a contract, if unpaid, they shall have a lien on the production of their labor and the lien shall attach only while title to the property remains in the original owner. In Pacific Petroleum Co. v. Sunbeam Oil Co., 176 Okla. 293, 54 P. 2d 1054, this court, following the language of section 11011, O. S. 1931, 42 Okla. St. Ann. § 96, relative to precedence of liens, and the holding in Morley v. McCaskey, 134 Okla. 50, 270 P. 1107, held that such lien for production of labor takes precedence over all other liens, whether created prior or subsequent to such laborer's lien. To the same effect was the holding in Home Building & Loan Ass'n et al. v. White et al., 141 Okla. 240, 284 P. 889, relative to the lien of a prior mortgage. This court further held in the Pacific Pet. Co. Case, supra, that where the record discloses that the lien statement was not filed within the time specified in the statute and the record fails to disclose an excuse for the failure to file such lien statement within the statutory time, the lien claimant is not entitled to the statutory lien, and that filing a lien claim with a receiver does not constitute a substantial compliance with the statute as to filing liens.

This court, further interpreting section 11007, O. S. 1931, in Haggard v. Sunray Oil Co., 176 Okla. 81, 54 P. 2d 662, held that a lien upon oil well casing for labor performed in pulling such casing from an abandoned well cannot be sustained under this section, for the reason that in such case the casing cannot be said to be "the production of their labor."

In Shefts Supply, Inc., v. Brady, 170 Okla. 590, 41 P. 2d 820, this court held:

"A lien granted to a laborer under section 11007, O. S. 1931 (sec. 7468, C. O. S. 1921) and under section 11011, O. S. 1931 (sec. 7472, C. O. S. 1921) takes precedence over prior recorded mortgage,

but is enforceable only against the improvements which represent the production of the claimant's labor."

And said:

"From the examination of previous decisions of this court, we find that the cases wherein sections 7468 and 7472, C. O. S. 1921, are held to be applicable in cases wherein the lien claimant has performed manual labor with his own hands in the construction of an improvement upon real estate, and in such case it has been held that such a laborer has a lien on the improvements so constructed by him, which is superior to a prior mortgage against the real estate itself."

We fail to find any case where the lien under this section was attempted to be enforced except where the improvements were upon real estate.

Section 11001, O. S. 1931, is a labor lien statute and provides that any person who furnishes labor for the production of, altering or repairing of, any personal property at the request of the owner shall have a lien for the value of his labor upon said personal property as provided for in section 2 of the act (sec. 11002, O. S. 1931), the lien to date from the commencement of furnishing of labor. Section 11002, supra, referred to, provides that the lien must be perfected by the filing of a claim in the office of the county clerk.

With this picture of the various labor lien statutes and their interpretation by this court before us, we will consider the status of the labor lien claimants in the instant case. It is very evident that they cannot base their claim under sections 11007 and 11011, O. S. 1931, supra, relied upon, for the reason (1) no real estate is involved; (2) the record shows that they did not perfect their lien as required by law. Pacific Petroleum Co. v. Sunbeam Oil Co., supra.

The lien claimants cannot rely upon section 11001, O. S. 1931, supra, relative to lien for altering and repairing personal property, even though we were to hold that the lien was applicable in the manufacturing of such products as are here in controversy, since section 11002,

supra, specifically requires that such lien must be perfected by the filing of a lien claim in the office of the county clerk, which was not done in the instant case.

It is very apparent that the original petitions in intervention filed herein on the part of the claimants for labor performed came within section 10999, O. S. 1931, relative to insolvent corporations and estates. The petitions state, in substance, that the laborers worked for the Olympic Corporation and that certain sums were due them and unpaid; that the corporation was insolvent; that their liens were prior to other liens. This section requires no specific act on the part of the lienholder for the protection of his lien. It is true that these labor claimants, later, filed amended petitions attempting to bring their cause within section 11007, supra, which, as we have shown, was without avail.

Section 10999, O. S. 1931, referred to, provides, in substance, that when a corporation doing business in this state shall become insolvent, the employees performing labor or services in regular employment shall have a lien upon the assets of such corporation for the amount of salary or wages which shall have accrued prior to the adjudication of the insolvency of such corporation, "which lien shall be paid prior to any other debts, charges or claims against said corporation, except taxes due the United States Government or the State of Oklahoma."

If it were conceded that the laborers had an existing lien under the provisions of section 11007, supra, and that the property involved was the production of their labor, or had such lien under the provisions of section 11001, supra, for altering or repairing personal property, and the lien claim had been perfected by filing same in time with the clerk, then their liens would be inferior to the lien of the State of Oklahoma, because of the more recent statutes quoted herein relative to liens for state taxes. Sections 12565 and 12573, O. S. 1931, as amended by sections 8 and 13 of chapter 111, S. L. 1933, supra, and the provision in the lat-

ter act which has a section repealing all laws or parts of laws in conflict therewith.

We must, therefore, conclude and hold that the claim and lien for the taxes due the State of Oklahoma herein is a superior lien to that of the lien for labor filed herein, and that such lien for the state includes all of the taxes found to be due the state for September, 1935.

Considering now the priority of the liens of the United States Government and the lien of the labor claimants, we think that under the provisions of section 10999, supra, the lien of the government is superior to that of the laborers. This section also was enacted long after the enactment of section 11007 or section 11001, supra, and gives a prior lien in favor of both the state and government. Further, we think that under the provisions of section 191 of title 31, U. S. C. A., supra (formerly section 3466 of Revised Statutes of the U. S.), as interpreted and quoted in Spokane County v. United States, supra, the government would have a superior lien to that of the labor claimants, since no proper statutory steps had been taken to fix the lien of the laborers prior to the time the property passed into the hands of a receiver.

In Guaranty Title & Tr. Co., Trustee, v. Title Guaranty & Surety Co., 224 U. S. 152, 56 L. Ed. 706, 32 S. Ct. 457, that court, construing section 3466, U. S. Comp. Stat. 1901, supra, in the light of the act of July 1, 1898, relative to priority of claims of the United States and claims for labor in bankruptcy cases, said:

"Labor claims are given priority, and it is provided that debts having priority shall be paid in full. The only exception is 'taxes legally due and owing by the bankrupt to the United States, state, county, district or municipality.'"

In Portneuf-Marsh Valley Canal Co. v. Howard Brown et al., Trustee, 274 U. S. 630, 71 L. Ed. 1243, 47 S. Ct. 692, that court, speaking of the superior lien rights under the Cary Act project passed by Congress, said:

"It is, of course, an implied term of every lien statute that the lien authorized is subordinate to liens for taxes."

The court cited Continental & Commercial Trust & Sav. Bank v. Werner, 36 Idaho, 601, 215 P. 458, construing same, in which the court held: "a lien for taxes is superior and prior to the lien of a Carey Act contract." We hold, therefore, that the lien of the United States Government for taxes due it by the Olympic Refining Company is superior to the lien of the labor claimants filed herein.

The labor lien claimants assert that the lien claimed by the state should be denied because the portions of the statutes under which it is claimed were promulgated as provisions of an amendatory act and that the provisions or similar provisions were not incorporated in sections of the statute amended. They therefore urge that a consideration and application of section 57 of article 5 of the Constitution of Oklahoma demonstrates the invalidity of the portions of the act referred to, in view of the holdings of this court. Gilmer v. Hunt, 167 Okla. 175, 29 P. 2d 59; Dickson v. Wright, 169 Okla. 159, 36 P. 2d 280; Board of Com'rs of Pott. Co. v. Alexander, 68 Okla. 126, 172 P. 436.

On the threshold of this question, we are confronted with the suggestion that the record does not indicate its presentation in the trial tribunal, and that therefore we are not authorized to treat it on appeal in view of those cases holding that questions relating to the constitutionality of statutes will not be considered for the first time on appeal. Duffey v. Scientific American Comp. Dept., 30 Okla. 742, 120 P. 1088; Fast v. Gilbert, 102 Okla. 245, 229 P. 275; Missouri, K. & T. R. Co. v. Prince, Co. Treas., 133 Okla. 228, 271 P. 253.

The rule alluded to is but a concrete application of the more general rule that a case presented to this court on appeal will not be decided upon a theory different than that presented to the trial

court, or sometimes stated in a prohibitive manner, that the parties will not be allowed to change their theory on appeal.

This is a rule of practice of general application. It is based upon practical necessity and orderly administration of the law and does not denote a limitation of the power of the appellate tribunal (3 Am. Jur. 26 and 32). It is not without exception or limitation. Thus, where questions of public policy or widespread public interest are involved, an appellate court may review a cause on a theory not presented in the trial tribunal. Magnolia Pet. Co. v. State, 175 Okla. 11, 52 P. 2d 81; Shaffer Oil & Ref. Co. v. County Treasurer of Creek County, 175 Okla. 6, 52 P. 2d 76. See, also, 3 Am. Jur. 35. The wisdom of this exemption is, we think, self-evident, for the rule itself is one of practice and designed to limit the scope of inquiry on appeal strictly to the controversy as it was presented to the lower tribunal. It is fair to the parties, however, when the question is of such a nature that the present welfare of the people at large, or a substantial portion thereof, is involved that the consideration of their rights merits a departure from the general rule and authorizes the court in its discretion to direct its attention to the general welfare, rather than the interests of the parties to the immediate cause.

That the exception to the general rule applies with equal force to the narrower concrete rule applying the principle to questions relating to the constitutionality of statutes is self-evident.

The statute here involved relates to taxation. It is a matter of daily and vital concern to the commonwealth. The tax-collecting authorities are operating under it constantly. We regard the interest of the public sufficiently involved to bring the matter within the exception mentioned, supra, and shall therefore consider the matter on its merits rather than dispose of it under the general rule of appellate procedure. We therefore return to a consideration of the constitutional question.

Section 57 of article 5 of the Oklahoma Constitution provides:

"Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes; and no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended, or conferred shall be re-enacted and published at length; Provided, that if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the law as may not be expressed in the title thereof."

It is pointed out that the sections of the statute under which the state is claiming its lien are sections 12565 and 12573, as respectively amended by sections 8 and 13 of chapter 111, Session Laws 1933, and it is urged that the sections as they were worded prior to the amendment were insufficient to authorize a lien on the property, as previously upheld in this opinion. It is urged that the language under which it was created was brought into the act by the 1933 amendment, and, being a new and different provision, could not be properly justified in an amendatory act.

In the case of Pottawatomie County v. Alexander, County Assessor, 68 Okla. 126, 172 P. 436, relied upon by lien claimants, this court held:

"*Though a particular section of a law may by amendment be broadened so as to bring within its provisions matter which could logically and legally have been placed in it* originally, such new matter must be something which had not been already specially and differently provided for in another section of the same statute and to which section no reference is made in the amendatory law.*" (Emphasis ours.)

With this rule relating to the proper breadth of acts amending particular statutory provisions in mind, we address ourselves to the title of the act now before us. It reads:

"An Act amending sections 12549, 12550, 12551, 12556, 12557, 12562, 12563, 12565, 12566, 12567, 12569, 12571, 12573, and 12529 Oklahoma Statutes, 1931, relating to, and providing for, the enforcement of the Gasoline Excise Tax Laws and the collection of Tax thereunder by the Oklahoma Tax Commission; defining the term 'Gasoline' and other terms; prescribing additional penalties for violation of the Gasoline Excise Tax Laws and authorizing additional rules and regulations pertaining thereto; defining embezzlement and perjury, for violation of this act and prescribing penalties; further extending provision for injunction and giving the commission authority in certain cases to declare the excise tax due and payable forthwith; authorizing exercise of discretion by commission in issuance, extension, reinstatement, suspension and cancellation of licenses; declaring what may be admitted as evidence in certain cases; repealing conflicting laws and declaring an emergency."

Both of the sections with which we are here concerned, and which were amended by chapter 111, S. L. 1933, supra, were, before amendment, a part of chapter 66, S. L. 1931, the title of which read:

"An Act providing for the enforcement of the gasoline excise tax laws, and the collection of taxes thereunder, by the Oklahoma Tax Commission; providing for rules and regulations by said commission, and for the expense of such collection and enforcement; prescribing penalties for the violation of this act; exempting certain purchasers from payment of said excise taxes; providing for the disposition of the monies collected hereunder; repealing conflicting laws, and for other purposes."

Thus both the amended act and the amendatory act, especially the particular sections herein involved, relate to the "enforcement of the gasoline excise tax."

The lien authorized by the amendatory sections is but a method of enforcement. It could have been originally included in the amended sections. Thus the law was by amendment "broadened so as to bring within its provisions matter which could logically and legally have been placed in it originally."

We are of the opinion that the provisions of the amendatory act authorizing the lien were, "in view of the subject matter of the sections amended," within the proper purview of the amendatory act and free from objection upon consideration of section 57, art. 5, of the Oklahoma Constitution.

Additional authorities supporting the view herein announced are: Fox v. Dunning et al., 124 Okla. 228, 255 P. 582; Dunlap v. Carter County, Board of Commissioners, 85 Okla. 295, 205 P. 1100; Griffin et al. v. Thomas, County Supt., et al., 86 Okla. 70, 206 P. 604; State ex rel. City of Durant v. Bonner, County Treasurer, 86 Okla. 280, 208 P. 825; Protest of Chicago, R. I. & P. Ry. Co., 162 Okla. 68, 19 P. 2d 152.

The judgment of the trial court is reversed, with directions to enter judgment as follows:

First, the chattel mortgage of the First National Bank of Alex shall be fixed as a first and valid lien upon the property herein involved.

Second, the priority of the various claims filed and found to exist and to be paid in the following order:

(a) The claim of the State of Oklahoma by the Oklahoma Tax Commission for taxes in the sum of $1,943.

(b) The claim of the United States Government for taxes in the sum of $2,-855.66.

(c) The claims of the labor lien claimants, claims to be paid in proportion as provided in the judgment of the trial court.

WELCH, C. J., CORN, V. C. J., and BAYLESS, GIBSON, and HURST, JJ., concur. RILEY and DAVISON, JJ., dissent. ARNOLD, J., absent.

———

DAVISON, J. (dissenting). I am unable to agree with the decision of the majority of my associates as to the priority of the claim of L. O. Carter and the First National Bank of Alex upon the tanks of oil in question.

The method selected in the foregoing opinion to extricate the sale of the oil from Olympic Refining Company to L. O. Carter from the class of transfers of personal property declared by section 10008, O. S. 1931 (24 Okla. St. Ann. § 6) to be void as to creditors is by determining that said sale was not a sale "within the meaning of that term as used" in said section. I do not find the term "sale" in the provisions of said section and will not agree that it applies only to a "sale" as distinguished from the broader and more comprehensive term "transfer." The real necessity of holding that there was no sale in the present case, however, was to arrive at the conclusion that what for all intents and purposes appeared to be a valid transfer of title from Olympic Refining Company to Carter was not that at all, even as between the two parties themselves; but that the bill of sale executed and delivered by Olympic to Carter pursuant to the purported sale was ineffective to divest Olympic of the title because no consideration passed from Carter to Olympic. The formulation of this hypothesis enabled the writer of the majority opinion to construe the mortgage from Carter to the First National Bank of Alex to be in reality a mortgage from Olympic Refining Company made through an intermediary or agent, and thereupon to conclude that same was a mortgage allowed by section 10012, O. S. 1931 (24 Okla. St. Ann. § 11) or "a mortgage . . . allowed by law," relieving the entire transaction from invalidity as to creditors under section 10008, supra.

The majority opinion recognizes that its conclusions are based upon a view of the evidence contrary to that entertained by the trial court. In my opinion, however, the judgment of the trial court cannot be said to be contrary to the evidence, and, under our rule of appellate review, must therefore be affirmed.

First, I will deal with the majority's general conclusion that the arrangements made at the meeting of Harris, Cole, and Carter on September 23, 1935, constituted only one, instead of two transactions; and that "the whole purpose of the transaction was to give to the bank which had advanced the money for the operation of the business a certain priority over the other creditors of the refining company. . . ." As I see it, such a conclusion is not only contrary to the evidence of what the parties actually did, but it is an unwarranted conjecture as to what they intended to do. All that was actually done was that Olympic Refining Company sold the oil to Carter, transferring title thereto by a bill of sale executed and delivered to said purchaser on behalf of Olympic by its manager, Cole; and Carter paid for same with his notes and a mortgage on the oil purchased. Since Olympic owed the bank, and the latter desired said indebtedness reduced, the notes and mortgage were executed to the bank rather than to Olympic. The reason that the latter was done was not to give the bank "priority over other creditors of Olympic Refining Company," but to terminate its status as a creditor of said company to the extent of $3,122.79, the major portion of the oil's purchase price. The undisputed evidence was that what the bank needed was not more or better security for money it had advanced to Olympic, but a reduction of said amount in order to comply with banking regulations. This, and the incorrectness of the quotation from the majority opinion, is further established by the undisputed evidence that after Harris realized the position the bank was in, and just previous to the meeting of the parties on September 23rd, he refused Olympic's offer made by Cole, its manager, to give the bank a mortgage on the oil in question.

Nor do I find anything in the circumstances of the situation to support the theory of the majority opinion. Here, all that happened was that a bank found one of its customers indebted to it in excess of the limit allowed for such an indebtedness by banking regulations. It thereupon called upon the debtor to reduce said indebtedness. After a conference concerning the matter it was found that the only possible or feasible way the debtor had of raising the money to pay

the bank and reduce the indebtedness was by selling its assets consisting of oil. I am unable to see that because a sale is made necessary by such circumstances, they, in themselves, are sufficient to constitute the purchaser the agent of either the seller or the bank; nor that such a conclusion is warranted from the additional circumstance that the consideration for the property sold is used in part to reduce said indebtedness and in part to secure further credit.

To support its view that the two transactions were only one, the majority opinion holds that there was no valid sale of the oil from Olympic to Carter, nor mortgage of it from Carter to the bank, because there was no competent evidence to show that Carter gave any consideration to Olympic Refining Company or received any from the bank. The evidence is undisputed that Carter executed his notes secured by a mortgage on the oil in the sum he agreed to pay for it. I have never understood that notes secured by a mortgage do not constitute good consideration, and such is not the law. Nor is it material that the notes and mortgage were executed and delivered to the bank rather than to Olympic. Can it be said that a consideration passes from a vendor to his vendee any less where the vendee, at the vendor's request, executes and delivers notes and a mortgage to the vendor's bank to obtain for said vendor cash or credits, than where he executes and delivers them directly to the vendor so that the latter may himself procure the same result by assignment to the bank? And if by so doing the vendee procures ownership of the goods purchased, can it be said that there was no consideration for the mortgage merely because the mortgagee named therein gave to him directly nothing in return therefor? Obviously, both of these questions must be answered in the negative, and they demonstrate one of the material distinctions between the present case and Iowa National Bank v. Citizens' National Bank of Woonsocket, R. I., et al., 70 Okla. 1, 172 P.

924, the only precedent which the majority opinion cites for the view therein adopted. In the cited case, Paxson, the purported vendee and mortgagor, neither gave anything nor received anything for himself by the bill of sale and mortgages to which he was a nominal party. In this case, however, Olympic transferred to Carter, as between itself and him, not just an empty paper title to the oil in question, but all of the rights of ownership in it that said company had, including the right to take possession of it and sell it. The evidence establishes, however, that said transfer of ownership was not accompanied by such delivery or change of possession as is required by section 10008, supra, to prevent it from being fraudulent as to creditors. The majority opinion does not assert, nor in my opinion can it be successfully asserted, that the trial court's judgment is contrary to law or to the evidence on this vital point. This being true, and being unable to agree with the majority opinion that said judgment is contrary to the evidence on the matters which comprise its foundation, I think the trial court's conclusion as to the transfer from Olympic Refining Company to L. O. Carter should have been sustained.

In my opinion, the application of the rule announced by the majority to fact situations like the one herein presented is not only unwarranted but exceedingly dangerous. I recognize that it is perfectly legal for a debtor to give one of his creditors preference over the others, but the majority opinion approves of a procedure by which he may very easily do more. By a transaction difficult, if not impossible, to establish as anything less than a sale, a debtor may place his personal property completely beyond the reach of his creditors. Thereafter, if it suits his purpose, he may claim and easily prove that he had divested himself of title to the property; or, on the other hand, if it serves his purpose better to claim that he has only mortgaged it, he may also do that, under the decision of the majority.

For the foregoing reasons, I respectfully dissent to that portion of the majority opinion upholding the claim of First National Bank of Alex, Okla., as a valid and subsisting first lien upon the oil involved herein.

I am authorized to announce that Mr. Justice RILEY concurs in the foregoing views.